**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | |
|---|---|
| KEVIN ROSENTHAL | ) |
|         Plaintiff, | ) |
| | ) |
|     v. | ) Case No. 2:13-cv-04150 |
| | ) |
| MISSOURI DEPARTMENT OF | ) |
| CORRECTIONS, et al., | ) |
|         Defendants. | ) |
| | ) |
| DEONTA DUDLEY, | ) |
|         Intervenor. | ) |

# ORDER

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. No. 134), which is considered below. For the reasons stated below, the motion is granted in part and denied in part.

## I. Background

Plaintiff filed the pending action on June 11, 2013. Intervenor Dudley joined the suit in 2014. Plaintiff and Intervenor are deaf persons who have been in the custody of the Missouri Department of Corrections (MDOC). Defendants are (1) MDOC, (2) George Lombardi (Director, MDOC), (3) Ed Davis (Superintendent, Ozark Correctional Center (OCC))[1], (4) James Hurley (Superintendent, Northeast Correctional Center (NECC)); and (5) various John Doe defendants. In the First Amended Complaint, Plaintiff and Intervenor Deonta Dudley sought declaratory and injunctive relief, as well as damages, for alleged discrimination by Defendants. First Amended Complaint, Doc. No. 60, pp. 6-9.

---

[1] Davis is no longer the warden at Ozark Correctional Center. <u>See</u> Doc. No. 134, Ex. H, Schultz Depo., at 9:10-19.

The First Amended Complaint contains fifteen counts: Count I – violation of the Americans with Disabilities Act (ADA); Count II – violation of the Rehabilitation Act (RA); Count III – class-wide claim for injunctive relief under 42 U.S.C. § 1983; Count IV – Plaintiff's individual claim for damages under 42 U.S.C. § 1983; Count V – Intervenor's individual claim for damages under 42 U.S.C. § 1983; and Counts VI - XV – Plaintiff and Intervenor's individual claims against various John Doe defendants under 42 U.S.C. § 1983.

On October 16, 2014, the Court entered an order granting in part Defendants' motion to dismiss as to Plaintiff Rosenthal's claims for injunctive relief in Counts I, II and III, and denied in part the motion to dismiss as to Intervenor Dudley's claims for the same relief. On November 18, 2014, the Court entered an Order denying claimants' motion for class certification. On March 12, 2015, the Court entered an order granting in part Defendants' motion for judgment on the pleadings as relates to dismissal of claims against Defendants Lombardi, Davis, and Hurley in their individual capacities in Counts I and II, as well as Count III in its entirety, and denying in part Defendants' motion for judgment on the pleadings as to Counts IV through XV. See Order, Doc. No. 131. Notably, the Court found that Defendants' arguments as to Counts IV through XV would be better heard on summary judgment, where a full record could be made as to (1) whether the claims stated by claimants are completely duplicative and thereby subsumed by the ADA and RA; and/or (2) whether Defendants were personally involved in the alleged violations such that they could be found liable under Section 1983.

In their motion for summary judgment, Defendants argue, among other things, that (1) Intervenor Dudley has not adduced sufficient evidence to support any violation of the ADA or RA; (2) claimants have not adduced sufficient evidence of a constitutional

Case 2:13-cv-04150-FJG   Document 147   Filed 02/19/16   Page 2 of 25

violation sufficient to state a claim under 42 U.S.C. § 1983; (3) claimants have not adduced evidence showing personal involvement of Lombardi, Davis, or Hurley in any constitutional violation; (4) Lombardi, Davis, and Hurley are entitled to qualified immunity; and (5) the claims against the "John Doe" defendants must be dismissed, as none have been identified and joined in this suit.

## II. Facts

### A. Plaintiff Rosenthal

Rosenthal graduated from high school in 1989 and attended less than a year of college. After leaving college, Rosenthal began working. Rosenthal considers himself to have a profound deafness, and was born with his current level of deafness. Rosenthal's parents and two brothers do not know how to communicate using American Sign Language (ASL). Rosenthal, however, communicates with his parents and brothers by reading their lips and by writing notes back and forth. Rosenthal is able to read, and was able to read the MDOC's written responses to Rosenthal's grievances.

Plaintiff Rosenthal testified that he can talk to people he is working with by using "really easy English words, maybe second or third grade kind of English" so the other people can understand him when he speaks. Doc. No. 140, Ex. 1, Depo. of Plaintiff, at 9:10-16. Plaintiff, however, indicates that written and verbal English is not his primary form of communication. Doc. No. 140, Ex. 2, Affidavit of Plaintiff, ¶ 8. When Rosenthal was at Ozark Correctional Center ("OCC"), he would communicate with Ralph Schultz ("Schultz"), who is employed at OCC as a grievance officer, by writing back and forth with each other. Doc. No. 134, Ex. F, Rosenthal Depo., at 61:4-11, Doc. No. 140, Ex. 1,

Case 2:13-cv-04150-FJG   Document 147   Filed 02/19/16   Page 3 of 25

62:1-11; see also Doc. No. 134, Ex. H, Schultz Depo., at 82:9-83:6.[2] If Rosenthal could not understand a word written by Schultz, Schultz would use a different word that meant the same thing as the word that Rosenthal could not understand. Doc. No. 134, Ex. F, Rosenthal Depo., at 61:4-11, Doc. No. 140, Ex. 1, 62:1-11. Plaintiff, however, indicates by affidavit, that he does not have the necessary English skills to completely understand what others are saying by note taking. Doc. No. 140, Ex. 2, ¶ 9.

Rosenthal does not have any complaints regarding specific actions of Lombardi, but named Lombardi as a defendant in this matter due to Lombardi's role as Director of the MDOC. Doc. No. 134, Ex. F, Rosenthal Depo., at 29:1-31:4. Rosenthal does not have any complaints regarding specific actions of Ed Davis ("Davis") or James Hurley ("Hurley"). Id. at 31:5-25.

Rosenthal testified that he has had no problems with teletype (TTY) systems at some MDOC facilities, but has experienced problems with the TTY system at other MDOC facilities. Id. at 18:6-20:17. When the MDOC facilities switched to Securus for telephone access, the TTY calls had to be made collect, and because a TTY phone call would sometimes take three or four times longer than what a hearing person's call would take, it cost him a lot of money. Doc. No. 140, Ex. 1 at 53:6-22; 54:12-17; 19:25-20:5. Rosenthal testified that his deaf friends who were not incarcerated did not use TTY phones, but instead use videophones, "which is new technology." Id. at 58:15-59:1. Rosenthal testified NECC has fire alarms equipped with strobe lights, which have different lights for different notifications. Doc. No. 134, Ex. F, Rosenthal Depo., at 70:9-14.

---

[2] Schultz testified that the first time he communicated with Rosenthal regarding a grievance he had an interpreter present. Schultz testified that thereafter he communicated directly with Rosenthal, who indicated he was okay without having an interpreter present. Doc. No. 134, Ex. H, 82:11-83:6.

4

## B. Intervenor Dudley

Dudley graduated from high school, at the Missouri School for the Deaf, in 1993. After graduating from high school, Dudley began working and worked at the Hyatt Regency. Dudley worked at the Hyatt Regency for approximately a year or a year and a half, until he entered prison in 1995. While working at Hyatt Regency, Dudley communicated with co-workers by writing notes with "pen and paper," and using hand gestures. Doc. No. 134, Ex. G, Dudley Depo., at 10:3-11, 10:18-11:1. Additionally, his sister helped him do some sign communication, coming in to work with him "maybe two times." Id. at 10:9-17. Although he is able to read and write, Dudley testified that he is not "really smart with the English language." Id. at 12:22-13:5.

Dudley named Lombardi as a defendant in this case because Lombardi is the Director of the MDOC and signed MDOC Policy D5-5.1. Id. at 18:12-19:2. Dudley also stated that Lombardi is a defendant in this case because "because he discriminates against deaf [inmates] and their rights and the policies." Id. at 18:16-18. Dudley does not know Davis and does not know why Davis was named a defendant in this case. Id. at 19:3-8. Dudley named Hurley as a defendant in this case because Hurley was the Warden at NECC during that time that Dudley was housed there, and allegedly ignored Dudley's rights and complaints. Id. at 19:9-20:11. Dudley never directly talked with Hurley about Dudley's complaints, and never directly requested any accommodations from Hurley. Id.

Dudley testified that while housed at Fulton Correctional Center, a vibrating alarm clock was provided to him. Id. at 74:13-75:13. Dudley testified that vibrating alarm clocks were not provided to him at other MDOC facilities, but have been available for purchase. Id. Dudley testified that he has refused to purchase a vibrating alarm clock

because he believes a vibrating alarm clock should be provided to him free of charge. Id.

## C. Missouri Department of Corrections, People and Policies

The prison grievance process starts with the inmate filing an Informal Resolution Request, also called an "IRR." Id. at 14:13-18. A case worker will attempt to resolve the IRR with the inmate and, if no resolution is achieved, a written response is given to the inmate. Id. at 14:19-15:8. If the response is not acceptable to the inmate, the inmate can file a grievance. Id. MDOC staff then responds to the grievance and if the inmate disagrees with this response, then the inmate can file an appeal. Id. at 15:9-22. MDOC staff then responds to the appeal, which concludes the grievance process. Id. An inmate must file an IRR within 15 days of the event giving rise to the complaint. Id. at 16:3-9, 21:6-12. MDOC staff that review and respond to IRRs and grievances receive "special needs offender training," which consists of a 4 or 8 hour class. Id. at 79:1-6.

Cari Collins ("Collins") is employed with the MDOC as the Director of the Division of Human Services, and serves as the MDOC's ADA Coordinator. See Doc. No. 134, Ex. I, Collins Depo., at 4:20-6:13. As the ADA Coordinator, Collins provides assistance to MDOC staff, reviews grievances related to the Americans with Disabilities Act ("the "ADA"), and ensures that the MDOC is in compliance with the ADA. Id. at 8:24-10:8.

The MDOC has a policy, Policy D5-5.1, which concerns deaf offenders housed within a MDOC prison. Doc. No. 134, Ex. I, Collins Depo., at 17:16-18, 21:12-16; see also Exhibit 2 of the Collins Deposition, attached to Doc. No. 134 at Ex. J. Collins testified to her opinion that a visual alarm will not necessarily make a deaf or hard of hearing inmate safer, as those inmates must rely on MDOC corrections officers to remove the offender from any housing unit or building in the case of an emergency.

6

Doc. No. 134, Ex. I, Collins Depo., at 24:24-25:13, 33:16-24.[3] Collins further testified that MDOC inmates that are deaf or hard of hearing can purchase a vibrating alarm clock or watch, or they can receive these items upon request. Id. at 33:25-35:1. Collins testified that, in her opinion, visual alarms and flashing alarms are not required by the ADA. Id. at 35:2-6. Collins testified that her opinion that visual alarms and flashing alarms are not required by the ADA was formed in part by her conversation with staff at the U.S. Department of Justice, who indicated that visual alarms and flashing alarms are not required by the ADA. Id. at 35:2-21. Collins testified in her opinion that in regard to the prison population, "the ADA is individualized for each individual offender who has an ADA request. Their need for aids is going to vary. And because of that, we have to look at them each individually in the environment where they live." Id. at 56:19-23.

Collins testified that MDOC staff had previously evaluated the possibility of video phones in MDOC prisons for use by inmates, but the prisons did not have the broadband capacity at that time to support video phones. Id. at 61:14-62:24. Over the last couple of years, broadband capabilities at MDOC prisons have increased, and MDOC staff are currently investigating and evaluating the possibility of implementing video phones in the MDOC prisons. Id. Collins further testified that the State of Missouri, Office of Administration, entered into a state-wide contract (the "Contract") in 2011 for the provision of certified sign language interpreters at state agencies, including the MDOC. Id. at 88:18-89:20.

---

[3] Claimants object to this "fact" as it contains expert opinion testimony that was not disclosed according to Fed. R. Civ. P. 26(a)(2)(B) or the Court's Scheduling Order. The Court will treat this statement not as a fact but as an opinion, without deciding whether to treat this statement as expert opinion pursuant to FRE 702 or lay opinion pursuant to FRE 701. Similarly, the Court treats the remaining statements of Collins' opinion in this paragraph not as fact, but as opinion testimony.

George Lombardi ("Lombardi") is Director of the MDOC. Doc. No. 134, Ex. K, Lombardi Depo., at 4:1-6. As Director, Lombardi's duties are to oversee the 20 MDOC prisons, two release centers, seven community supervision centers, and 54 parole offices, all of which consist of 32,000 incarcerated inmates, 65,000 people on probation or parole, and 11,500 staff. Id. at 4:7-12. Individual grievances filed by prisoners are not evaluated by Lombardi. Id. at 28:7-25.

### D.    Rosenthal's Specific Complaints

#### 1.    Sign Language Interpreters

##### a.    NECC-11-1575[4]

Rosenthal alleges he was issued a conduct violation on November 7, 2011, and that he was not provided with an interpreter at the initial joint interview for the violation. See Doc. No. 134, Ex. A, labeled 001801-1810.[5] Staff at NECC responded that MDOC Policy D5-5.1 does not require interpreters at the joint interview, but requires interpreters at the hearing on the conduct violation. NECC staff noted that an interpreter was provided for Rosenthal's hearing and, ultimately, the conduct violation was directed to be expunged. Doc. No. 134, Ex. A., at 001801.

##### b.    OCC-12-134

Rosenthal alleges that drug counselors at OCC failed to provide sign language

---

[4] Each separate complaint is identified by institution and number.

[5] Plaintiff objects to this fact because Defendants did not use a pinpoint citation to the record, and instead cite to ten pages of documents.  This Court, however, finds that this fact is amply supported by the record, and most of the pages within the citation directly support this fact.  Furthermore, plaintiff points to no evidence in the record refuting the truth of this assertion.  The Court, therefore, accepts this fact as stated in Defendants' briefing.  Similarly, the Court accepts Defendants' statement of facts regarding the inmates' specific complaints where Plaintiff's or Intervenor's only objection is to the lack of pinpoint citations in all subsequent iterations, unless otherwise noted by the Court.

8

interpreters to Rosenthal for a therapeutic peer review class (sometimes called a "TPR panel") on July 23-24, 2012. <u>See</u> Doc. No. 134, Ex. B, at 001838-1847. OCC staff responded that the omission of an interpreter at the TPR panel was a mistake, Rosenthal was not disciplined for missing the TPR panel, and the TPR panel was delayed until an interpreter was available for Rosenthal. <u>See</u> <u>id.</u>

### c.    OCC-12-169

Rosenthal alleges that staff at OCC failed to provide an interpreter for Rosenthal for a class on October 1, 2012. <u>See</u> Doc. No. 134, Ex. B, labeled 001853-1857. OCC staff responded that the interpreter scheduled to appear for Rosenthal's class was traveling to OCC when the interpreter became ill and, unfortunately, was not available to attend the class. By the time a replacement interpreter could have arrived at OCC, the class would have been over or would have been close to ending. Rosenthal was not penalized for missing any class time. <u>See</u> <u>id.</u> A portion of the multiple documents cited by Defendants also states, "To pay for an interpreter to be available 24 hours a day is not feasible and unwarranted." <u>Id.</u> at 001853.

### d.    OCC-13-45

In April 2013, Rosenthal complained that he should not be required to attend classes if no interpreter is present. <u>See</u> Doc. No. 134, Ex. B, labeled 001885-1187. OCC staff responded that if an interpreter is not available for a class, Rosenthal will not be responsible for the information given during that class, but that Rosenthal's counselor will ensure that Rosenthal has the information from the class so as to complete the program. OCC staff also advised Rosenthal that inmates must be in their assigned locations because OCC is a "prison setting" and, accordingly, Rosenthal must remain in his assigned location for the duration of the class. <u>See</u> <u>id.</u>  Within those

9

documents, Defendants also state, "[E]ven though it is preferable you attend all and participate to the degree possible, your situation is not that unique ... [I]t is not reasonable to have interpreters on standby on the possibility that you will need one. Your needs are important but they don't rise to the level of, for example, an emergency such as a fire or need for an ambulance where standby alternatives are a necessity." <u>Id.</u> at 001886.

### 2. Visual Alarms

#### a. OCC-12-175

Rosenthal alleged that on October 18, 2012, he could not hear the announcement that count time was taking place, and was warned by OCC staff he would receive a violation if he missed the next count time. <u>See</u> Doc. No. 134-3, Ex. B, pp. 23-29. OCC staff responded that announcements for count time are not required, but are merely a courtesy to the inmates, and that inmates are expected to be ready for count, which occurs at approximately the same time each day. In addition, because OCC is a "therapeutic community," in which the six inmates housed in the same room as Rosenthal are expected to help each other, those inmates are expected to ensure that all inmates are ready for count time. Furthermore, if no other inmates are present with Rosenthal, OCC staff are instructed to take into account that Rosenthal would not have heard the announcement for count time. <u>See id.</u> OCC staff further responded that while "[p]olicy states that assistive devices shall be made available to deaf or hard of hearing offenders who need them," the policy allows for "reasonable alternatives," and the OCC staff indicated that the therapeutic community is a reasonable alternate notification system.

### 3. TTY Phone System

### a.  NECC-11-1685

In November 2011, Rosenthal alleges the new telecommunications provider, Securus, assessed the Missouri Relay Service charge on users of the TTY phone system, whereas the prior telecommunications provider, PCS, did not assess that charge. See Doc. No. 134-3, Ex. A, pp. 20-31, labeled 003591. Staff at NECC responded that Securus is not required by the contract between Securus and the State of Missouri to absorb the cost of the Missouri Relay Service, and the cost of such service is borne by the individual using the system. See id.

### b.  OCC-12-195

In late 2012, Rosenthal requested the ability to make out-going telephone calls on the TTY system using pre-paid debit cards, instead of using collect calls. See Doc. No. 134-3, Ex. B, p. 35. In response to Rosenthal's request, OCC staff advised that long distance calls using the TTY system are connected to a Sprint operator and, because Rosenthal did not have a pre-paid account with Sprint, only collect calls could be made. However, OCC staff advised Rosenthal that his family could establish a pre-paid account with Sprint, which would allow Rosenthal to make long distance non-collect calls. See id.

### E.  Dudley's Specific Complaints

### 1.  Sign Language Interpreters

### a.  NECC-13-008

In January 2013, Dudley stated that he was not provided with a sign language interpreter during joint interviews on conduct violations, i.e., the initial reading of an alleged conduct violation. See Doc. No. 134, Ex. C, labeled 003637-3644. In response, NECC staff stated that Dudley did not request an interpreter during the joint interviews

11

and, in any event, NECC staff found that Dudley understood the nature of the conduct violations being assessed against him. NECC staff further noted that an interpreter was provided at each of Dudley's disciplinary hearings, except for one hearing, in which Dudley refused the use of an interpreter. See id.

### b.  NECC-13-29

In January 2013, Dudley stated that he was not provided an interpreter for a hearing on a minor conduct violation. See Doc. No. 134, Ex. C, labeled 003677-3680. NECC staff responded that NECC staff offered to provide an interpreter for Dudley, but staff indicated that Dudley refused that offer and voluntarily pled guilty to the minor conduct violation. See id. Dudley, however, indicates within his grievances, "I was asking for the interpreter," and "She has never got me an interpreter that I was ask[ing] for." Id., labeled 003678 and 003680.

### c.  NECC-13-895

In June 2013, Dudley stated that he was not provided with an interpreter for a disciplinary hearing on two conduct violations. See Doc. No. 134-4, Ex. C, pp. 24-29. NECC staff responded that NECC staff scheduled a re-hearing of the two conduct violations and provided Dudley with an interpreter. At the hearing, Dudley pled guilty to the two conduct violations. See id.

### 2.  Visual or Tactile Alarms

### a.  NECC-13-152

In January 2013, Dudley, while temporarily residing in a cell in the Administrative Segregation Unit (Ad-Seg), requested a cell equipped with flashing lights or a vibrating bunk. See Doc. No. 134, Ex. C, labeled 002129-2134. In response, NECC staff noted that cells within Ad-Seg were not equipped with such items and, in any event, Dudley

was reassigned to a cell outside of Ad-Seg shortly after his request. See id. Although NECC staff indicated that a card identifying Dudley as being deaf or hard of hearing was placed in the window of Dudley's cell, which alerted NECC staff that they must physically alert Dudley of any alarms or verbal directives, Dudley asserts that there was never a placard placed on his cell door in administrative segregation. See id.

### b. NECC-13-985

On approximately June 19, 2013, Dudley claims that he requested a vibrating alarm clock and suggested that NECC staff implement a video phone to replace the TTY phone system. See Doc. No. 134-4, Ex. C, pp.36-41. NECC staff responded that a vibrating wrist watch was available for purchase and that a TTY phone system was available for Dudley to use. See id.

### c. PCC[6]-13-204

Dudley claims that on February 10, 2014, inmates were allowed to go to canteen by a staff person "speaking loudly from the bubble" and that Intervenor is deaf and "could not hear whenever it [was] called out." Doc. No. 134, Ex. E, labeled 003735 3736. PCC staff responded that the specific time that Dudley was permitted to go to the canteen was posted and that it is the inmates' responsibility to go to canteen at their designated time. See id. Defendants further state, "[S]ince your cell mate showed up to canteen [,] that you should had [sic] showed up also. . . ." Doc. No. 134, Ex. E, labeled 003736.

### 3. TTY Phone System

### a. NECC-13-980

---

[6] PCC stands for Potosi Correctional Center.

13

Dudley claimed that on June 26, 2013, while residing in Housing Unit 7, he requested to use the TTY phone system and a case worker rejected his request, told him to use "the regular telephone," and threatened to move him to Housing Unit 6. Dudley claims that he was then transferred to Housing Unit 6 on June 28, 2013. See Doc. No. 134, Ex. C, labeled 002157-2162. Dudley indicates that the case manager in Housing Unit 7 displayed "an inappropriate attitude" with him. Id. at 002157. Dudley stated he was "in Housing Unit 7 for 6 1/2 months without access to the TTY phone and forced to use other offenders to assist ... with phone calls." Id. NECC staff denied that they rejected Dudley's requests or harassed or threatened Dudley. NECC, however, noted that Dudley was transferred to Housing Unit 6 on June 28, 2013, so as to have better access to the TTY phone system. See id. at 002157 ("CCMII Wagner states that you were moved to Housing Unit 6 so that you could access the TTY phone as it was unavailable in Housing Unit 7.").

### b. NECC-13-985

On approximately June 19, 2013, Dudley requested that NECC implement a video phone system. See Doc. No. 134-4, Ex. C, pp.36-41. NECC staff responded that a TTY phone system was available for Dudley and there is "no need for a video phone." See id.

### III. Standard

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–90 (1986). The moving party must carry the

14

burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586–90.

A nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

> The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citations and quotations omitted).

## IV.    Discussion

### A.    Counts I and II – Intervenor's Claim of Violation of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA)[7]

Following the Court's Orders on motions to dismiss (Doc. No. 92 (dismissing Plaintiff's claims for injunctive relief in Counts I, II, and III) and Doc. No. 131 (dismissing Counts I and II against Defendants Lombardi, Davis, and Hurley in their individual capacities), the only remaining claims in Counts I and II are Intervenor Dudley's claims for injunctive relief against Defendant MDOC and Defendants Lombardi, Davis, and Hurley in their official capacities only.

#### 1.    Mootness

In order for a plaintiff to receive injunctive relief from a defendant, that defendant must still be in the official capacity capable of granting that relief.  Randolph v. Rodgers, 253 F.3d 342, 345-46 (8th Cir. 2001) ("Randolph II").  With respect to the claims in

---

[7] The standards of review under the ADA and RA are nearly identical, and therefore the Court considers those claims together.

15

Counts I and II against Defendant Davis, those claims should be dismissed as moot, as Davis is no longer employed at Ozark Correctional Center (OCC) and is no longer in a position capable of granting relief. See Randolph II, 253 F.3d at 345-46. Similarly, Defendant Hurley serves as warden at Northeast Correctional Center (NECC). As Intervenor currently resides at Missouri Eastern Correctional Center (Dudley Depo, Ex. 4 to Doc. No. 140, 18:7-18:9), Defendant Hurley would not have power to give the requested injunctive relief to Intervenor. Thus, the claims for injunctive relief as to Defendant Hurley in Counts I and II must also be dismissed as moot.

Given that Intervenor remains in the MDOC system, however, his claims against Defendants MDOC and Lombardi (who, as director of MDOC, has authority over the entire MDOC) are not moot. See Randolph II, 253 F.3d at 346. In the initial appeal in Randolph v. Rogers, the court ruled that the plaintiff's motion for injunctive relief requesting a sign language interpreter was not rendered moot where the plaintiff sued the MDOC and the plaintiff was still under the control of MDOC. Randolph v. Rodgers, 170 F.3d 850, 857 (8th Cir. 1999) ("Randolph I"). Where an inmate asserted a claim directly against MDOC and the inmate is asserted that he is exposed to an actual future threat of not having an interpreter, the claim survived. Id. The Court reasoned that a claim alleging a violation of the ADA and RA would not be moot because MDOC controls "both prisons and the funding necessary to provide the sign language interpreter requested by Randolph." Id. The same analysis applies to Intervenor Dudley's complaints here.

The Court, therefore, turns to whether MDOC and Lombardi could be found to have committed violations of the ADA.

## 2. Specific ADA and RA Violations

16

Intervenor alleges that the Defendants violated the ADA and the RA in that they failed to provide effective communication for individuals with hearing disabilities, denying them the same access to defendant's services, benefits, activities, programs, or privileges as the access provided to hearing individuals. Doc. No. 60, First Amended Complaint, at ¶ 189. Intervenor alleges that the Defendants continue to deny him access.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such an entity." 42 U.S.C. § 12132. The RA provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

To state a prima facie case under the ADA and RA, Dudley must show (1) that he is disabled, (2) he is otherwise qualified for the benefit in question, and (3) he was excluded from the benefit due to discrimination based upon the disability. Randolph I, 170 F.3d at 858. Additionally, under the RA, Dudley must "show the program or activity from which he is excluded receives federal financial assistance." Id. An affirmative defense to a prima facie case under the ADA and RA is if the defendant demonstrates that "the requested accommodation would constitute an undue burden." Id. at 858. Neither party disputes the first two elements of the prima facie case, that Dudley is disabled and otherwise qualified for the benefit in question. Nor do the parties dispute

17

that the MDOC receives federal funds making the RA applicable. Rather, the parties dispute the third element, whether Dudley was excluded from the benefit due to discrimination based upon disability.

In order to show that the Intervenor was excluded from a benefit, the Intervenor must plead denial of meaningful access to services offered by the Defendants. Randolph I, 170 F.3d at 858. In Randolph I, the Court held that mere physical attendance does not equate with meaningful access as required by the ADA. Id. Thus the Plaintiffs may not argue that the Intervenor had meaningful access to benefits simply because the Intervenor was physically present at an event. Id. Meaningful access "must afford handicapped persons equal opportunity to . . . gain the same benefit." Loye v. Cnty. of Dakota, 625 F.3d 494, 499 (8th Cir. 2010) (quoting Alexander v. Choate, 469 U.S. 287, 305 (1985) and applying their reading of the RA to the ADA). The inquiry into whether meaningful access has been provided is "inherently fact-intensive" and "largely depends on context." Folkerts v. City of Waverly, Iowa, 707 F.3d 975, 984 (8th Cir. 2013).

Intervenor's claims that he was denied meaningful access can be divided into three broad categories. The Court considers each of these in turn.

### a. Sign Language Interpreters

The first is the use of sign language interpreters for different functions within the prison. As an initial matter, Intervenor and Plaintiff broadly alleged in the Amended Complaint that sign language interpreters were not provided to them for a variety of functions (classes, meetings, etc.). However, Intervenor has presented only the following claims through the administrative processes at MDOC: Claims NECC-13-0008, NECC-13-29, and NECC-13-895. NECC-13-0008 involves a complaint that

Dudley was not provided with a sign language interpreter during joint interviews on conduct violations (i.e., the initial reading of an alleged conduct violation). Staff responded that Dudley did not request an interpreter during the joint interviews. Claim NECC-13-29 indicates that Dudley stated he was not provided an interpreter for a hearing on a minor conduct violation, indicating that he was asking for an interpreter, and they never provided an interpreter for him. Staff responded that Dudley refused their offer to provide an interpreter and Dudley voluntarily pled guilty to the violation. Finally, Claim NECC-13-895 is that Dudley was not provided an interpreter for a disciplinary hearing on two conduct violations. Staff responded that they scheduled a re-hearing of the two conduct violations and provided Dudley with an interpreter. Defendants assert as to all sign language interpreter claims that Intervenor does not need an interpreter in order to understand what is taking place, arguing that he has sufficient communication skills, such as lip reading, reading, and writing, to understand proceedings.

Upon reviewing these claims, the Court finds that questions of material fact exist as to whether Intervenor requested an interpreter and was otherwise able to understand the nature of the proceedings against him, and therefore provided with meaningful access under the ADA and RA. Defendants MDOC and Lombardi's motion, therefore, is **DENIED** as to the sign language interpreter claims presented in NECC-13-0008, NECC-13-29, and NECC-13-895. Sign language interpreter claims that were not presented through the prison grievance process, however, are **DISMISSED.**

b.    Visual or Tactile Alarms

Intervenor's second category of claims asserts a violation of the ADA and RA because the Intervenor lacked visual or tactile alarms. Specifically, NECC-13-152

19

asserts that Intervenor, while in Administrative Segregation ("Ad-Seg"), requested a cell equipped with flashing lights or a vibrating bunk, and that request was denied because Ad-Seg units are not equipped with such items, and instead NECC staff placed a card identifying Intervenor as deaf or hard of hearing in the window to Intervenor's cell (Intervenor, however, asserts there was never a card placed on his cell door while in Ad-Seg). Additionally, in claim NECC-13-985, Dudley requested a vibrating alarm clock for no charge, and NECC staff responded that a vibrating wrist watch was available for purchase. Finally, in claim PCC-13-0204, Intervenor claims that he missed canteen because the only notice was a staff person speaking loudly, and he could not hear. PCC staff responded that the canteen time was posted, and it is the inmates' responsibility to go to canteen at their designated time.

In their motion for summary judgment and suggestions in support, Defendants only specifically address the first claim, the request for flashing lights or a vibrating bunk while in Ad-Seg. Accordingly, questions of fact remain for trial as to claims NECC-13-0985 and PCC-13-0204.

With respect to Claim NECC-13-0152 regarding Ad-Seg confinement, Defendants first argue that the claim is moot because Intervenor Dudley was moved out of Ad-Seg after a short period of time. However, the Court notes that in a case with similar facts, the Eighth Circuit previously held that where an inmate asserts a claim directly against the MDOC, he may be asserting exposure to an actual future threat that could occur again. Randolph I, 170 F.3d at 857. Accordingly, the Court finds the claims related to Ad-Seg confinement are not moot.

Defendants also suggest that flashing lights and/or tactile alarms would not keep deaf inmates safer while in Ad-Seg, because ultimately all inmates must rely on

corrections officers to move them in case of an emergency, giving the inmates meaningful access to alerts. Defendants also assert that a card identifying Intervenor as deaf was placed on his door in Ad-Seg. Intervenor, however, argues that no card was placed on his door. Furthermore, Defendant's policy regarding deaf and hard of hearing offenders provides that "flashing alarms" shall be made available to incarcerated deaf offenders. Doc. No. 134, Ex. C, labeled 002131 and Ex. J., labeled 000005-000006. The Court finds that questions of material fact remain as to whether a card was placed on Intervenor's door identifying him as deaf and whether reliance on corrections officers in Ad-Seg provides meaningful access to alerts. Accordingly, Defendants' motion for summary judgment is denied on this point.

c.     TTY Phone Use

The third category of Intervenor's claims relate to TTY telephone use. With Claim NECC-13-0980, Intervenor claims that he was in Housing Unit 7 for 6 ½ months without access to the TTY phone, and was forced to have others assist with his telephone calls. Defendants assert that this claim is false, and that Intervenor was only without access to a TTY phone for three days, which is not a violation of the ADA or RA. See Spurlock v. Simmons, 88 F.Supp.2d 1189, 1196 (D. Kan. 2000) (finding an inmate who was allowed two 30 minute TTY calls per week had meaningful telephone access). Given the dispute in facts between Defendants and Intervenor about how long Intervenor was without access to the TTY system, however, the Court must **DENY** summary judgment on this claim.

Finally, in Claim NECC-13-0985, Dudley requested that a video phone system be implemented in NECC. NECC staff responded that a TTY phone system was available for Dudley's use, and there is "no need for a video phone." Although video phones may

21

be the latest technology, Defendants note that the ADA and RA do "not . . . create a right for a disabled inmate to demand that the prison implement a specific type of service, program, or activity that is not already available." Douglas v. Gusman, 567 F.Supp.2d 877, 889 (E.D. La. 2008). Dudley argues in response that certain inmates in the Women's Eastern Reception, Diagnostic and Correctional Center ("WERDCC") in Vandalia, Missouri, are currently allowed to attend "video visits" and have access to video technology. Doc. No. 140, Ex. 10, Depo. of Dave Dormire, 29:8-12 and 31:18-22. Therefore, Intervenor argues that the same sorts of technologies could be implemented in other MDOC facilities. As noted in Defendants' reply, however, the ADA and RA require only "meaningful access," not equal access to what is provided to others. See Folkerts v. City of Waverly, Iowa, 707 F.3d 975, 984 (8th Cir. 2013); CERCPAC v. Health and Hosps. Corp., 147 F.3d 165, 168 (2d Cir. 1998) (noting that neither the ADA nor RA guarantee "any particular level of [services] for disabled persons"). The Court notes previous court decisions indicate that TTY access is "meaningful access" within the meaning of the ADA and RA. See, e.g. Spurlock, 88 F.Supp.2d at 1196; Douglas, 567 F.Supp.2d at 890. Accordingly, with respect to the Intervenor's grievance regarding provision of video phones instead of TTY systems, Defendants' motion for summary judgment is **GRANTED.**

> **B.** **Counts IV and V – Plaintiff's and Intervenor's Claims for Damages under 42 U.S.C. § 1983 against the Individual Defendants (Lombardi, Davis, and Hurley)**

In Count IV, Plaintiff requests relief under 42 U.S.C. § 1983 against Defendants Lombardi, Davis, and Hurley. In Count V, Intervenor requests relief under Section 1983 against the same individual Defendants. In order to prevail under Section 1983, plaintiffs must show that (1) defendants acted under the color of state law; and (2) the

alleged wrongful conduct deprived plaintiffs of a constitutionally protected federal right. Palmore v. City of Pac., 851 F. Supp. 2d 1162, 1168 (E.D. Mo. 2010). Additionally, the Plaintiff must demonstrate that each official violated the Constitution through his own individual actions. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

It appears to the Court that Plaintiff and Intervenor have not shown that Lombardi, Davis and Hurley had sufficient personal involvement to subject them to liability under Section 1983. Government officials cannot be held liable under the theory of respondeat superior for the unconstitutional conduct of their subordinates. Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691 (1978). In Plaintiff and Intervenor's depositions, they were unable to point to specific actions or inactions taken by Lombardi, Davis, and Hurley. [8] In their depositions, neither Intervenor nor Rosenthal were able to point to anything specific done by Davis; Rosenthal only named Lombardi and Hurley as defendants due to their position, and Dudley named Lombardi and Hurley as defendants because they discriminate against deaf people (Lombardi) or ignored his rights and complaints (Hurley). In their opposition to the summary judgment motion,

_____

[8] See Facts, *supra*, p. 4 (Rosenthal does not have any complaints regarding specific actions of Lombardi, but named Lombardi as a defendant in this matter due to Lombardi's role as Director of the MDOC. Doc. No. 134, Ex. F, Rosenthal Depo., at 29:1-31:4. Rosenthal does not have any complaints regarding specific actions of Ed Davis ("Davis") or James Hurley ("Hurley"). Id. at 31:5-25) and p. 5 (Dudley named Lombardi as a defendant in this case because Lombardi is the Director of the MDOC and signed MDOC Policy D5-5.1. Doc. No. 134, Ex. G, at 18:12-19:2. Dudley also stated that Lombardi is a defendant in this case because "because he discriminates against deaf [inmates] and their rights and the policies." Id. at 18:16-18. Dudley does not know Davis and does not know why Davis was named a defendant in this case. Id. at 19:3-8. Dudley named Hurley as a defendant in this case because Hurley was the Warden at NECC during that time that Dudley was housed there, and allegedly ignored Dudley's rights and complaints. Id. at 19:9-20:11. Dudley never directly talked with Hurley about Dudley's complaints, and never directly requested any accommodations from Hurley. Id.)

Intervenor argues that Hurley approved the denial of flashing lights and TTY telephone access as requested by the Intervenor (see Doc. No. 134, Ex. C). However, what Intervenor calls approving the denial are merely the warden's responses to Intervenor's grievances. In other words, the warden is, at most, approving how others handled Intervenor's claims. Similarly, Plaintiff asserts that Davis ultimately made the decision to not find in Plaintiff's favor regarding his request for flashing lights. See Doc. No. 140, Ex. 3, Depo. of Ralph Schultz, 62:7-9; 73:13-15. As noted by Defendants, however, the cited testimony of Mr. Schultz is not clear as to what grievance is being referred to and what Davis actually did. At the pleading stage, these sorts of allegations might suffice to allow a claim to proceed, but on summary judgment Plaintiff and Intervenor must set forth more factual support showing that Defendants, through their individual actions, violated the Constitution. This has not been done. Accordingly, summary judgment is **GRANTED** in Defendants' favor on Counts IV and V of the First Amended Complaint.[9]

### C. Counts VI – XV – Claims against John Doe Defendants

Both sides agree that Summary Judgment is appropriate on Counts VI-XV because the time for identifying and properly joining the John Doe defendants has

---

[9] Additionally, the Court notes that even if Plaintiff and Intervenor were able to show the individual involvement of Defendants Davis, Hurley, and Lombardi, Plaintiff and Intervenor have failed to demonstrate questions of material fact exist on their equal protection clause claim because the deaf inmates cannot be considered similarly situated to the hearing inmates. Hansen v. Rimel, 104 F.3d 189, 190 (8th Cir. 1997). Additionally, Plaintiff and Intervenor are unable to demonstrate a failure to protect claim under the Eighth Amendment because they have not demonstrated that there is a question of material fact regarding substantial risk of serious harm to the inmates and that the prison officials were deliberately indifferent to that substantial risk of serious harm. Jensen v. Clarke, 94 F.3d 1191, 1197 (8th Cir. 1996). Given that their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," moreover, Lombardi, Davis, and Hurley are entitled to qualified immunity. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

passed.  Accordingly, summary judgment is **GRANTED** as to Counts VI through XV of the First Amended Complaint.

## V.  Conclusion

Accordingly, for all the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. No. 134) is **GRANTED IN PART** as to (a) all claims against Defendants Davis and Hurley; (b) Intervenor Dudley's claim in Counts I and II regarding failure to provide video phones; and (c) Counts IV-XV of the First Amended Complaint.  Summary Judgment is **DENIED IN PART** as to Intervenor Dudley's claims for injunctive relief in Counts I and II against Lombardi and the MDOC regarding sign language interpreters, visual and tactile alarms, and denial of access to a TTY telephone.

**IT IS SO ORDERED.**

Date:  February 19, 2016                          **/S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                            Fernando J. Gaitan, Jr.
                                                 United States District Judge

25